[Civ. No. 67757. Second Dist., Div. Seven. Mar. 26, 1985.]

LOS ANGELES POLICE PROTECTIVE LEAGUE, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Loew & Marr, Cecil W. Marr and Robert J. Loew for Plaintiff and Appellant.

Ira Reiner and Gary P. Netzer, City Attorneys, Frederick N. Merkin, Senior Assistant City Attorney, Molly B. Roff and Pamela Victorine, Deputy City Attorneys, for Defendants and Respondents.

## OPINION

HARRIS, J.*—This appeal is from a judgment denying mandate to compel the City of Los Angeles to meet and confer with regard to its unilateral

*Assigned by the Chairperson of the Judicial Council.

institution of parking fees for 76 City employees assigned to work in a city-leased building in downtown Los Angeles, and also denying attorneys' fees against the city pursuant to section 1021.5, Code of Civil Procedure, and section 800 of the Government Code.

■ The question presented is whether the determination that the parking fees were not too trivial to trigger the meet and confer obligation, made by the employee relations board (ERB) created by the employee relations ordinance enacted by the City of Los Angeles in 1971 pursuant to the Meyers-Milias-Brown Act, is binding upon respondent city if no review is sought or, as contended by respondent city, is advisory only.

The Los Angeles Police Department's Planning and Research Division and Automated Information Division occupy leased facilities at 207 South Broadway in downtown Los Angeles and about 76 sworn personnel are employed at this location. These police department employees had not been required to pay a parking fee prior to December 1980. On September 8, 1980, the city council approved a continuation of the lease for the 207 South Broadway facility and a continued leasing of 100 related parking spaces to be used by employees at that facility. The city council also recommended that a uniform parking fee policy be maintained and in that regard instructed the department of general services to issue parking passes and to collect a $5 monthly parking fee from all city employees utilizing those leased parking spaces adjacent to 207 South Broadway, effective December 1, 1980. The city made no effort to meet and confer with the appellant prior to implementing the monthly $5 parking fee for employees at the 207 South Broadway location. There is no reference to employee parking in the memorandum of understanding between the city and the league, nor is there any history of memorandum of understanding negotiations on the subject.

Appellant, as a recognized bargaining agent, requested to meet and confer prior to the implementation of the city council's parking fee policy, which request was denied. Appellant filed an unfair employee relations practice claim against management alleging that management committed an unfair employee relations practice under the city's employee relations ordinance by refusing to meet and confer regarding the parking fees.

The hearing officer found that alternative parking in commercial lots nearest to 207 South Broadway averages about $50 per month and more distant lots average $15 per month, and that a recent survey suggested that about 54 percent of the city's 7,500 civic center employees used their own cars to get to work, 27 percent resorted to carpools, and 17 percent used buses.

From this the hearing officer concluded that driving and parking were urban necessities "[i]n the real world of 1981 in Los Angeles," to which employees must continue to resort even at an imposed incremental reduction in real earnings.

The hearing officer further found that the city violated its obligation to meet and confer when it unilaterally imposed the $5 monthly parking fee and recommended an "administrative make-whole order" as the most efficient method of resolving the problem. The employee relations board unanimously adopted the recommendations of the hearing officer and ordered the city ". . . to cease and desist from refusing to meet and confer with the Los Angeles Police Protective League on the subject of employee parking fees, to reinstate the status quo ante as of December 1, 1980, to make whole affected employees by refunding all such fees collected until such time as it has fulfilled its legal obligation to meet and confer, and to post a notice of this action in all locations where affected employees work."

The city by letter declined to comply with the order above quoted assigning "several reasons," among them ". . . that a five dollar ($5.00) per month parking fee is de minimus and therefore not subject to the meet and confer process. The Council disagrees with the ERB's ruling on the merits in UERP No. 308; the City Council believes that a five dollar ($5.00) monthly increase in parking neither materially nor significantly impacts upon employee working conditions."[1] Despite its announced disagreement respondent city did not invoke Code of Civil Procedure section 1094.5 to review the decision and order and it has long since become final. Appellant league filed its petition for peremptory writ of mandate under Code of Civil Procedure section 1085 to enforce the order.

The trial court regarded itself as bound by the decision of this court in *Social Services Union* v. *Board of Supervisors* (1978) 82 Cal.App.3d 498 [147 Cal.Rptr. 126] (hereinafter "*Santa Barbara*"), and ruled accordingly. In construing the "meet and confer" obligation imposed upon public agencies by the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) this court in *Santa Barbara* turned to cases interpreting the National Labor Relations

---

[1]The other reasons assigned by the city were as follows: "Additionally, the City Council believes that the ERB exceeded its jurisdiction when it ordered the City Council, as a legislative body, to reimburse parking fees previously collected. The City Council does not believe that an administrative agency created by the Council by ordinance can interfere with the Council's legislative functions. The ERB's Order intrudes upon the rights, powers and authority of the City Council and as such constitutes an intrusion that is beyond the jurisdiction of the Employee Relations Board. The portion of the ERB's Order ordering a make whole remedy mandating the City to refund all parking fees collected since December 1, 1980 exceed's the Board's powers as set forth in the Employee Relations Ordinance (L.A. Ad. Code, Section 4.810(f)(4)) and is thus beyond the ERB's express jurisdiction."

Act which the Meyers-Milias-Brown Act parallels. After noting a disagreement between decisions of the National Labor Relations Board (NLRB), and decisions of the federal courts of appeal, this court in *Santa Barbara* followed the reasoning of the federal judicial decisions rather than that of the federal administrative agency, and adopted a narrower definition of "wages, hours, and other terms and conditions of employment" in determining the scope of the "meet and confer" obligation. Accordingly, a resolution by the Board of Supervisors of the County of Santa Barbara calling for a uniform charge of $4 per month for all employee reserved parking spaces, raising the existing fee of $3.50 per month at the "Administrative Building" and $2.50 per month at the "Garden Street Lot," was held by this court in *Santa Barbara* not to be a meet and confer obligation.

Appellant argued before the trial court that *Santa Barbara* had been overruled by the United States Supreme Court in *Ford Motor Co.* v. *NLRB* (1979) 441 U.S. 488 [60 L.Ed.2d 420, 99 S.Ct. 1842]. The trial court refused to follow that argument, as has the First District Court of Appeal in *Solano County Employees' Assn.* v. *County of Solano* (1982) 136 Cal.App.3d 256 [186 Cal.Rptr. 147]. The court pointed out in *Solano* at page 261, footnote 4, that the *Ford* court did not dispense with the materiality analysis but indicated that it would defer to the evaluation of the employees and the NLRB in determining whether a matter is trivial.[2] Here it

---

[2]The United States Supreme Court in *Ford* answered the "too trivial" argument in the following language: "As for the argument that in-plant food prices and service are too trivial to qualify as mandatory subjects, the Board has a contrary view, and we have no basis for rejecting it. It is also clear that the bargaining-unit employees in this case considered the matter far from trivial since they pressed an unsuccessful boycott to secure a voice in setting food prices. They evidently felt, and common sense also tells us, that even minor increases in the cost of meals can amount to a substantial sum of money over time. In any event, we accept the Board's view that in-plant food prices and service are conditions of employment and are subject to the duty to bargain.

"Ford also argues that the Board's position will result in unnecessary disruption because any small change in price or service will trigger the obligation to bargain. The problem, it is said, will be particularly acute in situations where several unions are involved, possibly requiring endless rounds of negotiations over issues as minor as the price of a cup of coffee or a soft drink.

"These concerns have been thought exaggerated by the Board. *Its position in this case, as in all past cases involving the same issue, is that it is sufficient compliance with the statutory mandate if management honors a specific union request for bargaining about changes that have been made or are to be made. Ford Motor Co. (Chicago Stamping Plant)*, 230 N. L. R. B., at 718; *Westinghouse Electric Corp.*, 156 N. L. R. B. 1080, 1081, enf'd, 369 F.2d 891 (CA4 1966), rev'd en banc, 387 F.2d 542 (1967). The Board apparently assumes that, as a practical matter, requests to bargain will not be lightly made. Moreover, problems created by constantly shifting food prices can be anticipated and provided for in the collective-bargaining agreement. Furthermore, if it is true that disputes over food prices are likely to be ·frequent and intense, it follows that more, not less, collective bargaining is the remedy. This is the assumption of national labor policy, and it is soundly supported by both reason and experience." (*Ford Motor Co.* v. *NLRB*, *supra*, at pp. 501-502 [60 L.Ed.2d at p. 431].)

is clear that neither the hearing officer nor the employee relations board regarded the parking fee as trivial.[3]

It is to be noted that *Santa Barbara* did not arise after an administrative hearing and the scope of review of the trial court on mandate was not there involved. In that case the board of supervisors took the position that the increase in parking fees was not a "meet and confer item" and refused a demand by the union that the increase in fees be rescinded and arrangements made "to meet and confer." The local then filed a complaint in the superior court seeking mandate to compel the supervisors to meet and confer on the issue with the local, and injunctive relief enjoining the county from carrying the newly adopted parking charges into effect. The county demurred to the complaint, the demurrer was sustained without leave to amend, the action was dismissed, and the appeal followed. In the case at bar there was a hearing at which testimony was taken under oath, exhibits were received, briefs were filed, and findings and recommendations made by the hearing officer, which were subsequently adopted by the employee relations board as to the reasoning therein contained.

Respondent having elected not to review the decision and order under Code of Civil Procedure section 1094.5, it became final and binding upon the trial court[4] unless respondent is correct in its position that the decision and order was "advisory only." The answer to this question requires an examination of the Meyers-Milias-Brown Act and the Employee Relations Ordinance of the City of Los Angeles.

The Meyers-Milias-Brown Act provides that "[a] public agency may adopt reasonable rules and regulations . . . for the administration of employer-employee relations under this chapter (commencing with Section 3500)" and that the "rules and regulations may include provisions for . . . procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment . . . ." (Gov. Code, § 3507.)

---

[3]The hearing officer noted, "It could hardly be seriously contended that the City, without violating its obligation to meet and confer in good faith, could unilaterally reduce the hourly wage of its police employees by .07 cents (or, say, by 22 cents per workday) as an economy move or for whatever felt necessity. Could such an incremental reduction of real wages, unilaterally effectuated, conceivably be justified by the invocation of a de minimus rationale that it only amounted to a few paltry pennies?"

[4]The trial court regarded itself as bound by *Santa Barbara*, although it had difficulty with the position advanced by respondent city. The augmented record shows the following comment by the court: "First you start out at $5.00 a month; that becomes de minimus, the next year it becomes $10.00, but if you look at what's happening from day one to the present day then it doesn't become de minimus. Again, what I think I'm going to do in this case is say yes, I'll follow this case but set the base now at $5.00. Now, if you want to raise it more than $5.00 then I don't think this applies any more."

The City of Los Angeles Employee Relations Ordinance was enacted in 1971 as a consequence of the Meyers-Milias-Brown Act. One of the purposes of the ordinance was "to establish policies and procedures for . . . the resolution of disputes regarding wages, hours and other terms and conditions of employment." (L.A. Admin. Code, § 4.800.) The determining body was defined as the body "who has final authority to make a decision . . . ." (L.A. Admin. Code, § 4.801.) Fact finding was defined as, among other things, "the investigation and reporting of the facts by one or more impartial fact finders . . . ." (L.A. Admin. Code, § 4.801.) "Impasse" was defined as, among other things, a deadlock ". . . over the scope of matters upon which [representatives] are required to meet and confer." (L.A. Admin. Code, § 4.801.) The employee relations board is given the power "[t]o investigate and determine the validity of charges of unfair employee relations practices, to make findings, and to issue orders to cease and desist which are not in conflict with other provisions of law" and also "[t]o act upon requests for . . . fact finding in connection with the resolution of impasses . . . ." (L.A. Admin. Code, § 4.810, subd. (f)(4), (11).) If the employee relations board concludes that in fact an impasse exists, "it may appoint one or more . . . fact-finders to assist the parties." (L.A. Admin. Code, § 4.840, subd. (a).) It is an unfair employee relations practice "[t]o refuse to meet and confer in good faith at reasonable times" and "[t]o fail or refuse to cooperate in impasse procedures. . . ." (L.A. Admin. Code, § 4.860, subd. (a)(3), (4).) In short, the whole thrust of the employee relations ordinance is for the final resolution of disputes and impasses by fact finding. Nothing in the ordinance suggests that there may be an advisory finding of fact which the loser is free to reject and continue the dispute.

The essence of the city's position is that the employee relations board is a part of city government and the city council is the "governing body" of the city (L.A. City Charter, § 22); therefore, the employee relations board cannot bind the city council. In this connection respondent points out that the employee relations ordinance itself provides that "[t]he rights, powers and authority of the City Council in all matters, including the right to maintain any legal action, shall not be modified or restricted by this chapter." (L.A. Admin. Code, § 4.880, subd. (b).)

In *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609], the City of Glendale similarly contended that a memorandum of understanding approved by it was not binding upon it and that its city council could by ordinance set the salaries of city employees differently than as provided in the memorandum of understanding. The Supreme Court held that the memorandum of under-

standing bound the City of Glendale and asked at page 336, "Why negotiate an agreement if either party can disregard its provisions?"

In *Berkeley Police Assoc.* v. *City of Berkeley* (*Taylor* v. *Crane*) (1979) 24 Cal.3d 442 [155 Cal.Rptr. 695, 595 P.2d 129], the memorandum of understanding provided for arbitration of disciplinary dismissals. A Berkeley police officer who had been dismissed by the Berkeley City Manager for disciplinary reasons demanded arbitration. The decision of the arbitrator was that the officer should be suspended, but not dismissed. The city refused to comply, and argued that the arbitrator's decision was not binding on the city because it conflicted with the city charter, which gave the city manager the authority to dismiss employees. The dissent pointed out that the Meyers-Milias-Brown Act under which the memorandum of agreement was negotiated expressly provided that it did not supersede local charters. (24 Cal.3d at p. 455.) The majority nevertheless held that the grant of disciplinary power to the city manager by the charter may not be construed as a limitation upon the city's authority to agree to arbitration and that the city had done so in the memorandum of understanding.

*United Firefighters* v. *City of Los Angeles* (1984) 153 Cal.App.3d 383 [200 Cal.Rptr. 233], involves the same employee relations ordinance with which we are here concerned. There, a fire captain received a disciplinary suspension. He sought and received a board of rights review as provided for in the Los Angeles City Charter. He then sought to invoke the grievance procedure under the parties' memorandum of understanding. The memorandum of understanding provided: "Nothing in this grievance procedure shall be construed to apply to matters for which a remedy is provided by provisions of Section 135 of the City Charter." The city refused to participate at all levels of the grievance procedure, including binding arbitration. United Firefighters filed a petition in the superior court to compel arbitration, which was denied, and then appealed.

On appeal the court pointed out that the memorandum of understanding was entered into under the Employee Relations Ordinance of the City of Los Angeles, which required that a grievance procedure be incorporated into any memorandum of understanding and that the memorandum of understanding provide for arbitration of all unresolved grievances. Under the employee relations ordinance, said the court, at page 387: "The grievance procedure 'shall apply to *all* grievances'" (L.A. City Admin. Code, div. 4, ch. 8, § 4.865, subd. a, italics added) and 'shall provide for arbitration of all grievances not resolved in the grievance procedure.'" The court then held the grievance procedure provided by the memorandum of understanding, including binding arbitration, was available despite the provisions of

the Los Angeles City Charter. This division has recently followed the reasoning and conclusions of *United Firefighters* as sound. (*Los Angeles Police Protective League* v. *City of Los Angeles* (1985) 163 Cal.App.3d 1141 [209 Cal.Rptr. 890].)

The employee relations ordinance quite clearly provides for fact finding. The city had the power at the time of adoption of the ordinance to agree to binding fact finding. (*Taylor* v. *Crane, supra,* at p. 451.) We believe the language of the ordinance compels the conclusion that this is what was done. Los Angeles Administrative Code section 4.880, subd. (b) does not appear to us to be inconsistent with such a construction of the ordinance and we believe the construction we adopt is the preferred construction as a means of resolving labor disputes quickly and inexpensively. (*United Firefighters* v. *City of Los Angeles, supra,* at page 389.)[5]

■ The employee relations board ordered respondent city to cease and desist from refusing to meet and confer, to reinstate the status quo ante as of December 1, 1980 with respect to fees for employee parking, to make whole the employees represented by the union by refunding all fees collected for parking at 207 South Broadway, and to post a copy of the order. Respondent contends that the board cannot order affirmative relief, pointing out that the employee relations board was created by city ordinance and that the employee relations board's powers are specifically limited in relation to unfair employee relations practices to issuing ". . . cease and desist orders which are not in conflict with other provisions of law." (L.A. Admin. Code, § 4.810, subd. (f)(4).) The hearing officer acknowledged "some doubt" as to ". . . whether a make-whole remedy, rather than a simple cease-and-desist order, is within the legislated purview of the ERB," but implied that power.[6]

---

[5]Appellant's brief urges that any decision of this court operate prospectively only, lest this court's decision be offered in support of motions to dismiss other pending actions under the doctrine of failure to exhaust administrative remedies. We believe this point to be well-taken and therefore declare that in other actions presently pending involving the City of Los Angeles, where labor or management has filed directly in the superior court alleging that a hearing before the ERB is a futile remedy because of the city's position that the decisions and orders of the ERB are "advisory only," the decision herein shall have prospective application only. The declaration of R. Douglas Collins filed by respondent city in opposition to the petition for mandate discloses that the employee relations board has issued 42 decisions on unfair employee relations practice claims since its inception and has also issued 20 orders directing compliance by the City of Los Angeles. Of the 20 orders issued, the city has complied with 15 and has refused to comply with 5, presumably including the order here involved.

[6]The reasoning of the hearing officer was as follows: "Without that remedial dimension, the ERB's order to cease and desist has a distinctly hollow sound. Would not an ERB finding of wrongful reduction of wages suffice to establish a ground for recovery by deprived employees, as individuals or as a class, in court? It seems fiscally quite wasteful, even irresponsible, to require duplicative litigation when an administrative make-whole order in the original proceeding could achieve the same result in its final directives in this proceeding."

We do not reach this issue because the city did not seek review of the order, it has become final, and it is not subject to attack by the city at this late date. There is no question that the superior court has the power to order a make-whole remedy. (*Campbell Municipal Employees Assn.* v. *City of Campbell* (1982) 131 Cal.App.3d 416, 425 [182 Cal.Rptr. 461].)

■  Appellant also requests attorney fees under either Government Code section 800 or Code of Civil Procedure section 1021.5. A like request was made in *Wilkerson* v. *City of Placentia* (1981) 118 Cal.App.3d 435 [173 Cal.Rptr. 294], which is similar to this case in the manner in which it was disposed of at the trial level.

In *Wilkerson* a probationary employee of the city was summarily discharged following his arrest for alleged theft of city property. The charges were later dismissed and Wilkerson was ordered reinstated to his job after an arbitrator ruled that the discharge was arbitrary and capricious. The arbitrator specifically declined to rule on the issue of Wilkerson's back pay since that was beyond his jurisdiction. The city rejected Wilkerson's claim for back pay on the ground that it was exercising its lawful right to impose a lesser discipline of reinstatement with loss of pay and benefits, and that its decision was not one subject to the grievance procedure, relying upon *Fugitt* v. *City of Placentia* (1977) 70 Cal.App.3d 868 [139 Cal.Rptr. 123]. Wilkerson petitioned for mandate to compel the city to pay him his lost wages and benefits for the period of his wrongful discharge, and for attorney fees and general damages. The petition for the writ was denied by the trial court on the ground that the case of *Fugitt* v. *City of Placentia, supra,* was controlling and binding upon it.

The Fourth District determined that *Fugitt* was neither applicable nor controlling on the trial court and that mandate was proper to compel payment of back salary. On the issue of attorney fees under Government Code section 800, the court in *Wilkerson* explained at page 444, ". . . that section is applicable only to civil actions appealing from a finding or award or other determination of an administrative proceeding. But plaintiff is not appealing any finding or award or other determination of the arbitrator—he seeks a writ of mandate compelling back pay from his employer because of disciplinary action taken against him by that employer contrary to his constitutional rights. No appeal from the administrative hearing is involved." Similarly, there is no appeal from the administrative hearing here and the plaintiff seeks to enforce the ERB decision and order, not attack it. Accordingly, an application for attorney fees under Government Code section 800 is inappropriate.

Plaintiff in *Wilkerson* also sought attorney fees under Code of Civil Procedure section 1021.5. The court concluded that under such circumstances it was not proper procedure to remand the matter of attorney fees to the trial court for consideration. Said the court at page 445: "This is the procedure followed in *Woodland Hills Residents Assn., Inc.* v. *City Council, supra*, 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200]. There, the Supreme Court reversed a trial court's denial of fees and remanded based on the intervening enactment of Code of Civil Procedure section 1021.5. Here, we have the case where the trial court never got to the issue because of its decision on the merits. It appears to us that where the entire basis for the decision in this regard is what we have done in this opinion, we should make the decision that it qualifies as a case for granting of [attorney] fees." Such rationale is unsound.

In *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200], the Supreme Court repeatedly stated that entitlement to attorney fees under section 1021.5 is an issue to be determined initially by the trial court: "Although defendants seek to escape a remand in this case by suggesting that the present record conclusively demonstrates that plaintiffs' action does not qualify for an attorney fee award under the new statute, we have concluded that in light of the parties' conflicting characterization of the effect of the underlying litigation the trial court should appropriately evaluate the attorney fee question pursuant to section 1021.5 in the first instance" (*Woodland Hills, supra*, 23 Cal.3d at pp. 925-926); "the trial court should determine the propriety of attorney fees under section 1021.5 after a hearing which properly focuses on the criteria established by that statute." (*Id.*, at p. 933; see also pp. 938, 940-941, 942.) Usurpation of the trial court's function by the *Wilkerson* court cannot be justified by the fact that there the trial court did not reach the question of attorney fees because it rendered judgment against the plaintiff, whereas in *Woodland Hills* the trial court did not reach the question because section 1021.5 was not then in existence. As stated in *Brennan* v. *Board of Supervisors* (1984) 153 Cal.App.3d 193, 197 [200 Cal.Rptr. 192]: "We are further instructed by *Woodland Hills Residents Assn., Inc.* v. *City Council, supra*, (which must reasonably be deemed the leading case on the instant issue), that reviewing courts are *not* 'in a position to decide the question [of propriety of attorney fees] in the first instance,' and that the trial court is best fitted to determine whether 'an attorney fee award is appropriate in order to assure the effectuation of an important public policy.' (23 Cal.3d at pp. 941, 942.)" (Original italics.) If the trial court, regardless of the reason, had no occasion to make the initial decision regarding the propriety of an award of attorney fees under section 1021.5, the appellate court should not undertake that task, but should remand the matter to the trial court for

determination of the question after giving both parties an opportunity to present evidence in support of their conflicting contentions as to the applicability of the statute.

On remand the trial court following a hearing, must determine plaintiff's claim of attorney fees based on the court's evaluation of whether plaintiff's action (1) served to vindicate an important public right, (2) conferred a significant benefit on the general public or a large class of persons, and (3) imposed a financial burden on plaintiff which was out of proportion to its individual stake in the matter. (See Code Civ. Proc., § 1021.5; *Baggett* v. *Gates, supra,* 32 Cal.3d 128, 142; *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at pp. 935-942.) If the court finds that an award of attorney fees is warranted, it should determine the amount of fees to which plaintiff is entitled on appeal as well as in the trial court. (*Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323, 336 [163 Cal.Rptr. 700]; *Gunn* v. *Employment Development Dept.* (1979) 94 Cal.App.3d 658, 666 [156 Cal.Rptr. 584].)

The judgment is reversed and the cause remanded to the trial court for issuance of a writ of mandate compelling respondent city to meet and confer on the subject of fees for employee parking, to reinstate forthwith the status quo ante as of December 1, 1980, with respect to fees for employee parking, and to make whole the employees represented by the union by refunding all fees collected for parking at 207 South Broadway pursuant to the parking policy imposed by respondent city, until such time as the obligation to meet and confer has been satisfied. Upon remand the trial court shall also determine the attorney fees issues above enumerated.

Reversed and remanded for further proceedings consistent with the views expressed in this opinion.

Thompson, Acting P. J., and Johnson, J., concurred.

A petition for a rehearing was denied April 23, 1985, and respondents' petition for review by the Supreme Court was denied June 5, 1985.